# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISON

UNITED STATES OF AMERICA,

      Plaintiff,

                    Case No. 19-cr-00231
                    Hon. PAUL L. MALONEY

vs.

JOSEPH FRANCIS BRISSON, II,

      Defendant.
_____/

SANFORD A. SCHULMAN
Attorney for Defendant
      JOSEPH BRISSON
500 Griswold Street, Ste. 2340
Detroit, Michigan 48226
(313) 963-4740
Email: saschulman@comcast.net

STEFANIE L. LAMBERT
Attorney for Defendant
      JOSEPH BRISSON
500 Griswold Street, Ste. 2340
Detroit, Michigan 48226
(313) 963-4740
Email: attorneystefanielambert@gmail.com

ALEXIS SANFORD
U.S. Attorney
The Law Bldg.
330 Ionia Ave., NW
P.O. Box 208
Grand Rapids, Michigan 49501
(616) 456-2404
Email: alexis.sanford@usdoj.gov
_____/

<u>**DEFENDANT, JOSEPH FRANCIS BRISSON, II's
SENTENCING MEMORANDUM**</u>

NOW COMES the Defendant, JOSEPH FRANCIS BRISSON, II, by and through his attorneys, SANFORD A. SCHULMAN and STEFANIE L. LAMBERT and state in support of the Defendant, JOSEPH FRANCIS BRISSON, II's Sentencing Memorandum as follows:

<u>INTRODUCTION AND OVERVIEW</u>

For nearly forty-five years, Joseph Brisson has been known as a dutiful son, dedicated and supportive father of two sons, step-father of three daughters, honorable member for 23 years in the military including the US Army, National Guard and Air Guard where he had served in active duty in Somalia, Haiti, Iraq, Qatar, Germany and Jordan receiving recognition for his service including medals, awards and certificates and even graduated from First Sergeant Academy. (See Exhibit 1: Military Awards).

It is with this background that anyone who knows Joseph is utterly baffled by his current criminal case and considers this an isolated incident and a side effect of the medication he was taking and a variance from the son, father, employee and soldier that everyone has known.

The question before this Court is what punishment should be meted out for Joseph's conduct in placing a hidden camera in the bathroom of his step-daughter and storing those few images in his computer in light of his personal history. This

court should consider the 3553 sentencing factors and individualize the sentence accordingly. In doing so, this court should consider that Joseph Brisson has no criminal history and no significant police contact. He passed two polygraph examinations, one provided through the US Attorney's Office, which queried him on the issue of whether there was any other inappropriate conduct. (See Exhibit 2: Polygraph Results).

In addition to the polygraph results, the defense also submits the psychiatric evaluation of Joseph Brisson, II prepared by Gerald A. Shiener, M.D. (See Exhibit 3A, Report and Recommendation from Dr. Gerald A. Shiener, filed restricted access) and the report and evaluation of Melissa Fleszar a doctor or nurse practice (See Exhibit 3B, Report and Recommendation from Melissa Fleszar, DNP, Harmony Health Family Practice, filed restricted access), the current medical reports which includes a history of testicular cancer, high blood pressure/hypertension, gastrointestinal issues and recently a diagnosis Stage 3 Chronic Kidney disease which has been downloaded to Stage 2 kidney disease. (See Exhibit 4, Current Medical Reports, filed restricted access). If this court is to impose a custodial sentence, this Court should consider that there is a twofold increase in the risk of death due to COVID-19 in people with high blood pressure when compared to those without high blood pressure. That COVID-19 patients who have chronic kidney disease (CKD) or develop coronavirus-related kidney

injury in the intensive care unit (ICU) face higher odds of death than their otherwise-healthy peers, according to a study published late last week in Anaesthesia.

The defense is cognizant that the offense carries upwards of 10 years imprisonment and that the Rule 11 Plea Agreement provides that the Court must sentence the defendant to a term of incarceration of not less than 5 years. Interestingly, the presentence investigator makes no mention of this 60-month mandatory minimum in the report and the defendant mentions this in the addendum. A sentence of 60 months and the terms and conditions recommended by probation including reporting on the Sex Registry, substantial fines and all other terms and conditions is sufficient but not greater than necessary. The draconian advisory sentencing guidelines of 135-168 months does not take into consideration the unusual facts and circumstance of this case, the isolated nature of the offense, the military and personal history of the defendant, the comments and recommendations of the complaint and her family, the amount of time on pretrial home imprisonment and full and complete acceptance of responsibility.

   A.    Nature and Circumstances of JOSEPH FRANCIS BRISSON, II's Offense and His History and Characteristics

   The Offense

The case began with Joseph and his wife Samantha's concern regarding a report from their minor child's school relating to images on her cellular phone. In

response, Joseph purchased a camera disguised as a telephone charger and placed it in his teenage step-daughter's bathroom with the intent of viewing what images his step-daughter was creating. During this time, Joseph had been prescribed Phentermine, a medication used for weight loss. At the same time he was taking a metabolism boost supplement which when combined had a unexpected reaction including severe mood swings, uncommon outbursts, trouble sleeping, dizziness, and restlessness. It is well documented, that such a combination can mirror dosages of amphetamines a central nervous system stimulant that affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control.

There is no evidence that Joseph has ever sought or purchased or even viewed child pornography prior to this incident. He denies that emphatically. This is a very very unique and isolated incident. Indeed, after a full examination of Joseph's phones, computer and social media, no evidence of any inappropriate images or text messages were found to exist. This is in reality the first and only time that this occurred and only came to fruition by way of Joseph's own admission during a final phase interview for a federal law enforcement position.

Joseph Brisson appeared before U.S. Magistrate Judge Phillip J. Green and accepted full responsibility by pleading guilty to counts one through three in the Superseding Information all of which charged possession of Child Pornography a violation of 18 USC Sec. 2252A(a)(5)(B), (b)(2). All three counts involved the

same complainant and were three images taken from a camera and transferred to a home computer.  The images were from a few day period and were taken during a time that Mr. Brisson had been using Phentermine and other supplements that had a significant mood changing affect.

Outstanding and Withdrawal of Objection

The defense objected to paragraphs 39, 40 and 51 which impacts paragraphs 45, 49, 99 and 125 as it relates to the court's use of USSG Sec. 2G2.2©.  However, the defense is aware of the fact that the Sixth Circuit adopted the Second Circuit's interpretation of "use," similarly holding that this element is "fully satisfied for the purposes of the child pornography statute if a child is photographed in order to create pornography." United States v. Wright, 774 F.3d 1085, 1090 (6th Cir. 2014). As such, the defense withdraws its objection.

Full Acceptance of Responsibility

 Mr. Brisson has expressed tremendous remorse for his conduct.  He has filed no pretrial motions and pled guilty at his earliest opportunity. Mr. Brisson admits to transferring the 4 short video clips from the camera onto his computer and in fact he provided the password to authorities to his telephone and computer where the files were stored.  However, the images were never distributed.  Never sold.  Never shared.  Simply hidden.  Even his step-daughter was unaware that the images existed.

IT SHOULD BE NOTED THAT JOSEPH BRISSON HAS ALWAYS

DENIED HAVING ANY SEXUAL CONTACT WITH ANY MINOR.  EVER.

HE HAS DENIED IT AND HAS PASSED A POLYGRAPH EXAMINATION.

See Exhibit 2: Polygraph Results).

Mr. Brisson has been devasted by this case.  His life will never be the same.

His ability to obtain gainful employment, where he lives and who he is with will

forever be altered.  All he has worked for in his life will be hidden under the cloud

of this one episode.  His education, exemplary military career and his dedication to

his family are now overshadowed by this case.  Nevertheless, Joseph has assured

himself and others that this will not define him and that he will seek to regain the

confidence of his friends and family and the community.  That the man who served

this county over and over again in the toughest of conditions, the man who

maintained employment and supported his family and the man who put family and

country as his top priories would once again reemerge and be seen for who truly is

and not for this one isolated lapse in judgment.

Despite the Draconian advisory sentencing guidelines, this Court has the

discretion to consider a sentence below the advisory guidelines and given the

totality of the circumstances, a sentence of sixty months would be appropriate and

sufficient.   Mr. Brisson is requesting that this sentence be served as home

confinement if possible. That sentence would also require reporting, fines,

probation and a status that itself carries essentially a life sentence. No additional prison beyond the five years serves any purpose.

Characteristics of Joseph Brisson

Joseph was born and raised in Marquette, Michigan and has been a dedicated son and later father to 5 children including three step-daughters. He graduated from Norther Michigan University where he received an Associated Degree and a Bachelor's degree. After 23 years in the military and an honorable discharge, Joseph worked for Level 3 Communications in Colorado and stayed on as a traditional member of the Air National Guard.

Psychological Evaluation

According to the psychological evaluation conducted by the psychiatrist Dr. Shiener, Joseph Brisson "successful completion of military service at the level of achievement he described, in conjunction with his ability to secure and maintain employment and maintain a loving relationship, suggest that he did not manifest intent to offend in his placement of the cameras, and he represents no risk to society or the community" and that in the opinion of the psychiatrist "I do not believe that society or the community would be served by incarceration.

….that [Brisson] was taking a psychostimulant - Phentermine. Phentermine is an adrenergic and dopaminergic agonist that has an effect of reduction of appetite. When taken in conjunction with caffeine-containing

products and other stimulants, it is capable of causing significant impairments in judgment and impulse control…"

<u>Nature of Child Pornography Cases</u>

Technology has changed the nature of this offense.  In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort.  As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously.  Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it.

In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer.  See U.S. Sent'g. Comm'n, Report to the Congress: Sex Crimes Against Children 29 (1996) [U.S. Sent'g Comm'n, 1996 Report].  In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer.  U.S. Sent'g. Comm'n, Use of Guidelines and Specific Offense Characteristics (2011); U.S. Sent'g Comm'n, 2011

According to the Commission, "technological changes have resulted in ready accessibility of child pornography," including graphic sexual images of very young victims, which "previously was not widely circulated." Child Porn Report at 6. Now that the "typical" child pornography case involves images depicting "prepubescent children engaging in sexually explicit conduct," id. at 84, the current guideline "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior," id. at 322-23,

As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. See, e.g., United States v. Garate, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of Gall, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); United States v. Pauley, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after Gall, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," id. § 3553(a)(2)(A), and "adequate

deterrence," id. § 3553(a)(2)(B)); <u>United States v. Gardellini</u>, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

B.    Legal Framework

While this Court must still correctly calculate the guideline range, Gall v. United States, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, id. at 51; Nelson v. United States, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  Kimbrough v United States, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," id. at 49-50 and explain how the facts relate to the purposes of sentencing.  Id. at 53-60; Pepper v. United States, 131 S. Ct. 1229, 124243 (2011).  The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  Id. at 101; Pepper, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy.  Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 552 U.S. at 101-02 (internal punctuation omitted) (citing Rita v. United States, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

C.     The Sentencing Commission's Report to Congress

In February 2013, the Sentencing Commission released a report to Congress on the child pornography See U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ["Child Porn Report"].  The Commission

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life."  Id. at 79.  It reported that recent studies show that "appropriate 'treatment interventions . . .  are associated with lower rates of recidivism—some of them very significant,'" id. at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5

(2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." Id. at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." Id. at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. Id. at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Id. at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." Id. at xx; see also id. at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." Id. at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." Id. at xviii-xix, 322-23.

Joseph Brisson is not a pedophile. Any suggestion that Mr. Brisson had any sexual contact with a minor is false and an attempt to embellish. Mr. Brisson has denied any sexual contact with a minor. Ever. He has never inappropriately touched a minor. He submitted to a polygraph examination on this very question and passed without any reservation. His crime is that he possessed child pornography a charge that carries no mandatory minimum sentence.

Mr. Brisson acknowledges this was wrong. He never distributed the video on any public form. Never attempted to sell the video. The images were never discovered, they were revealed by Mr. Brisson during the last phase of his interview as Customs and Border Protection Officer. Consistent with his erratic

mood swings, his outburst admitting to the images supports the defense contention that this was during a period of time that Mr. Brisson was suffering from the affects of his medication.

A similar case in state court, where this is no allegation of criminal sexual conduct, no injuries and no prior record of any significance, would likely result in a probationary sentence.

In accordance with THE CRIME VICTIMS'RIGHTS ACT (CVRA) codified at 18 U.S.C. § 3771(b)(1) the complainant with her mother, voluntarily submitted to a psychiatric evaluation conducted by Roy Lubit and provided same to the defense which is attached herein and filed under restricted access. (See Exhibit 6, letter from complainant and Evaluation of Complainant). It is clear that the complainant will suffer serious psychological consequences if the prosecution goes forward.

D. Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring

that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected.  The guidelines' offense level is not intended or designed to predict recidivism."  U.S. Sent'g Comm'n, Measuring

Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"].  See also Part IV.A.3, infra.  And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions."  Francis T. Cullen et al., Prisons Do Not Reduce Recidivism:  The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011).

Nor does lengthy imprisonment of sentences associated with child pornography have any deterrent or preventive effect on the production or dissemination of child pornography.  There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet."  Beiermann, 599 F. Supp. 2d at 1103; id. at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").  The Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing."  Child Porn Report at 98.

E.  Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C)

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children.   This belief is contrary to the empirical research in general and is unjustified based on the evidence in this case.

Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012), and "online offenders who had no history of contact offenses almost never committed contact sexual offenses."  Michael C. Seto et al., Contact Sexual Offending by Men With Online Sexual Offenses, 23 Sexual Abuse 124, 137 (2011); see also Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years);  Helen Wakeling et al., Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting

Recidivism by Internet Sexual Offenders, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass et al., The Consumption of Internet Child Pornography and Violent Sex Offending, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, The Criminal Histories and Later Offending of Child Pornography Offenders, 17 Sexual Abuse 201, 207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb et al., Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest

subgroup of internet offenders would appear to pose a very low risk of sexual recidivism").

As one district court recently put it, "the empirical literature [] generally concludes that there is little—if any— evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses."  Marshall, 870 F. Supp. 2d at 492.

The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, see U.S. Sent'g Comm'n, Measuring Recidivism at 12-13 & Ex. 10; U.S. Sent'g Comm'n, Recidivism and the "First Offender" 8 (2004), as does substantial other research. For sex offenders, cognitive behavioral therapy substantially reduces recidivism. U.S. Dep't of Justice, Center for Sex Offender Management.

In the case at bar, the defendant, Joseph Brisson, has never been charged with any sexual misconduct case in his life.  In fact, he has never been charged with any felonies his entire life.

The guidelines in the pending case are extremely high.  It should be noted that in the time since the guideline for possession and production of child pornography was first promulgated, the offense level and mandatory minimums have increasing exponentially. In 1978, Congress first outlawed the production of child pornography and included a mandatory minimum penalty of two years of

imprisonment for repeat offenders. By 1996, Congress had increased the penalties for production of child pornography to require a mandatory minimum penalty of ten years of imprisonment for first-time offenders. Similarly the charge for transportation of a minor with intent to engage in sexual activity now carries a mandatory ten-year sentence.

The Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act of 2003 would continue to increase the mandatory minimums. In the pending case, the possession of child pornography charge starts with a base level of 32 and then received 4 points for enhancements. Points were assessed based on the age of the complainant and Mr. Brisson's relationship with her mother. No points, however, were reduced because he has never had any sexual contact with any minors. No points are reduced because he did not distribute any photos on the internet. No points are reduced for the length of time he has remained crime free.

<u>Time while on Home Confinement</u>

The defendant has been on pretrial home incarceration since May 4, 2020, that is eight months in addition to the eight months he served in custody prior to his pretrial release. Pretrial home incarceration prevents Mr. Brisson from leaving the house in any manner. This Court can consider this form of incarceration in

fashioning a sentence.  There have been no violations of his pretrial release and home incarceration and no allegations of any violations.

<u>Letters from Family, Friends and the Complainant  Other Factors:  Family Obligations</u>

Attached are numerous letters from family and friends who have known Joseph for most of his life and provide insight into his character.  The letters echo a common and recurring description of Joseph Brisson as honorable and committed and loyal. (See Exhibit 5, Letters from Family, Friends, employers, etc.)

<u>Inability to cooperate and receive a substantial departure based on information regarding criminal activity.</u>

The defendant understands that the plea agreement leaves this Court with no authority to impose a sentence of less than 60 months.  The parties entered into this agreement.  But the 60 months mandatory minimum could have been set aside if Mr. Brisson had aligned himself with criminals.  If he had associated with murderers or carjackers or terrorists he would have been greatly rewarded with a 5k1.1 motion, likely under seal, that would have lifted the mandatory minimum and allowed this court to impose even a probationary sentence, despite the current plea agreement.  Unfortunately, Joseph has no such connections or information. He will not be rewarded for spending time in the military and with his family and working and avoiding the criminal element.  Of course, he has accepted responsibility but even those who accept responsibility have this option of a

reduced sentence not likely because of anything they did that was favorable or productive or honorable, but because they have information regarding criminal activity and as such they reap a reward that is simply not available to Joseph.

<u>Requested Sentence to Allow for Joseph Brisson to serve as caregiver for Father and Wife</u>

The defense is requesting that any sentence allow him to serve as a caregiver for his father and wife both of whom have grown increasingly dependent on his assistance.

F.     Requested Sentence

In light of the defendant's lack of criminal history; absence of deviate sexual history, lack of any evidence his exhibits any pedophilia characteristics, his employment history and military history, his health issues, his self-described feelings of shame and remorse regarding this offense; acceptance of responsibility for this offense; acknowledgment of the harmful results of engaging in similar activity involving children and their vulnerability; his intellectual ability to benefit from appropriate and long-term therapeutic intervention; access to supportive family members who can become allies in behavioral monitoring and recovery; and his willingness to comply with the court's orders.  The defense would urge this court to consider a sentence of Sixty Months and, if possible, that this sentence be served as home confinement in light of his high risk if he were to contract COVID-19 given is preexisting conditions which makes him a high risk candidate.

If a custodial sentence is imposed the defendant would ask to be permitted to voluntarily surrender to the designated facility and for a recommendation to be placed in Elkton Ohio Federal Camp where he can participate in any treatment and therapy.

Respectfully submitted,


/s/ Sanford A. Schulman
SANFORD A. SCHULMAN P-43230
Attorney for Defendant:
    JOSEPH FRANCIS BRISSON, II
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
saschulman@comcast.net

Date:  January 13, 2021